```
            UNITED STATES DISTRICT COURT
         SOUTHERN DISTRICT OF WEST VIRGINIA
                    AT CHARLESTON
```

**UNITED STATES OF AMERICA**

v.                                    CRIMINAL ACTION NO. 2:05-00253

**MATTHEW JUSTIN CLARK**

### MEMORANDUM OPINION AND ORDER

The court conducted an evidentiary hearing on defendant's motion to suppress on January 11, 2006. Following receipt of briefing by the parties, the court by a preponderance of the evidence makes the findings of fact and, in turn, the conclusions of law that follow.

On September 21, 2004, the defendant, Matthew Clark, using the alias Mike Duncan, delivered a package to Mail Box Plus in Charleston, West Virginia to be sent by Federal Express. It is conceded in the defendant's motion to suppress and the government's briefing that the package was addressed to S. Marino, 27510 Sierra Madre Drive, Marrieta, California 92563. Both the name of the sender, Mike Duncan, and the name of the addressee, S. Marino, were fictional.

Upon entering Mail Box Plus, the defendant picked up a Federal Express envelope and returned to his vehicle parked

outside for a lengthy period of time. The defendant was observed, through the store window, by the manager of Mail Box Plus, Charles Grishaber, as the defendant upon returning to his vehicle inserted "stuff" into a magazine, put the magazine in the envelope and filled out the paperwork. The defendant then paid the appropriate fee and left the package with Mail Box Plus.

While in the hands of Mail Box Plus, the package was opened by Grishaber who was suspicious of its contents because he discerned that the sender, the defendant, was acting suspiciously. Grishaber thought it threw up a red flag when the sender insisted on keeping the top copy of the paperwork for the package since Grishaber normally keeps the top copy for his billing records.

Grishaber observed the contents of the opened package to be "Thousands and thousands of what I thought was money order receipts or money orders at the time. I wasn't sure." Contained within the package was approximately $30,000 in Western Union receipts of $500 each and perhaps one or two money orders, all interspersed within the pages of a magazine. Upon discovery of its contents, and having served as a confidential informant for the Drug Enforcement Agency (DEA), Grishaber recognized the likelihood that the contents were drug related. He thought it was unusual to send that kind of money by

Federal Express rather than wire transfer. He then contacted the Charleston office of the DEA and asked for Bob Negro, a DEA special agent with whom he had worked on other occasions. Grishaber had in the past supplied DEA agents with information involving shipments of drugs or money.

Grishaber related to Negro what he had found. Negro, who was out of the area at the time he spoke to Grishaber by telephone, asked Grishaber to photocopy the Western Union receipts and money orders and drop the photocopies off at DEA headquarters, which Grishaber did. When Grishaber contacted him, Agent Negro understood the package was already opened rather than sealed because Grishaber described the contents. Negro further directed Grishaber to restore the items photocopied to the magazine within the package and send it on to Federal Express, which he did. Negro then secured the package from Federal Express and held it overnight while he decided the next step to take. The next day Negro directed that the package be sent on by Federal Express to the designated California address. When Federal Express delivered the package, DEA agents conducted a surveillance at the designated address where it was received by Paula Santos and another individual who promptly left in Santos' vehicle. The Santos vehicle was followed by the agents who lost the vehicle in traffic. The package was not recovered.

3

Grishaber, while manager of the Mail Box Plus operation in Charleston, has for several years served as a confidential source for DEA and other law enforcement agencies. On a number of occasions he has been paid for the information that he has furnished to DEA, receiving such payments on the dates and in the amounts following:

| Date | Amount |
|---|---|
| 02-20-98 | $  900.00 |
| 06-04-99 | $  900.00 |
| 09-02-99 | $1,206.73 |
| 05-03-02 | $  800.00 |
| 04-14-04 | $  500.00 |
| TOTAL: | $4,306.73 |

At least the last two of the payments were made under an agreement with the DEA entitled "Confidential Source Agreement," a form of agreement that Negro says became a standardized practice while Janet Reno was Attorney General. Both agreements are found on a DEA form designated "DEA-473," and are signed by Grishaber as the confidential source and by two DEA agents. The last agreement was signed by Negro and Todd Davis, both of whom are designated thereon as controlling investigators.

The $800 payment on May 3, 2002, was made under a confidential source agreement containing the following provision in paragraph numbered 13 of part II Acknowledgments:

> I understand that this agreement is in force from   4/4/02   until   4/4/03   (not to exceed one year).

The $500 payment on April 14, 2004, was made under a confidential source agreement containing the following provision in paragraph numbered 13 of part II Acknowledgments:

> I understand that this agreement is in force from   3-18-04   until   3-18-05   (not to exceed one year).

Under paragraph numbered 9 of part II Acknowledgments in each agreement the following provision is contained:

> I understand that although I may be eligible for compensation for my services, the DEA reserves the exclusive right to determine whether I will receive any payment or compensation and to determine the amount of such payment or compensation.

The defendant furnished information of a drug related nature to DEA on other occasions than the five listed above for which he was not paid.  Two of those occasions have occurred since March 18, 2004, the beginning date of the last agreement.  One of these was in March 2005 and the other in October 2005.  On still other occasions Grishaber was involved in tracking an individual for other government agencies that used his facilities and contacted him for assistance, but Grishaber was not paid for

those services.  One of those instances was in 2002 or 2003 and another was in July or August 2004.

The information and photocopies supplied by Grishaber to Agent Negro on September 21, 2004, were not paid for by DEA. Grishaber had furnished the information with the hope but not the expectation of being compensated.  His greatest motivation to do so was a desire to help clean up crime in the neighborhood of his business operation primarily because he sustained a 10% to 15% drop in business the next day after a shooting or drug bust occurred in that area.

The agreement for the year extending from March 18, 2004, to March 18, 2005, was drawn up based on information that Grishaber had furnished on or about March 18, 2004, with respect to a $50 pair of tennis shoes that was being shipped at a cost of about $200.  Grishaber, believing the circumstances to be suspicious, discovered $4,800 hidden in the shoes.  He contacted DEA and informed Negro of what he had found and gave Negro a description of the shipper and the address given of each the shipper and the addressee.  Negro met with Grishaber, took the $4,800 from the package, and the package was sent on to the addressee in Tennessee.  Because the prior agreement for the period of April 4, 2002, to April 4, 2003, had "lapsed" and Grishaber had been "deactivated", Negro and the DEA decided, as a

6

gesture of good will, to reactivate Grishaber by entering into the new agreement for the year beginning March 18, 2004, and paying him $500 on April 14, 2004.

Agent Negro testified at the hearing on the motion to suppress that Grishaber remained active under the latter agreement only three to four months until he was deactivated by internal paperwork within DEA placing him on inactive status at which point he was no longer under close supervision by DEA or under its control.  Agent Negro says that the deactivation was memorialized by the execution of what he described as a DEA Form 6 and that Grishaber was not reactivated when he contacted DEA on September 21, 2004.  No copy of that form has been furnished to the court.  Further, Grishaber was not notified that he had been deactivated.  Rather, Grishaber supposed the agreement was in force in September, 2004.  Grishaber did not ask for payment with respect to the September 21, 2004, event, and was neither given nor offered payment.

DEA thereupon reactivated its investigation of the defendant that had been closed a few months earlier with respect to other activities by him.  Grishaber did not know that the defendant was under investigation when he opened the defendant's package and spoke to Agent Negro.

7

The legal issue arising on the motion to suppress is whether the search conducted here by a private person constituted a government search triggering Fourth Amendment protections. In resolving this issue, the two primary factors to be considered are as follows: (1) whether the government knew of and acquiesced in the private search; and (2) whether the private individual intended to assist law enforcement. <u>United States v. Jarrett</u>, 338 F.3d 339 (2003). Both factors must be affirmatively shown. <u>Id.</u>

The government concedes the second factor, namely, that Grishaber intended to assist law enforcement. The first factor, however, has not been demonstrated. Neither the government nor Agent Negro knew of or acquiesced in the private search made by Grishaber that revealed the $30,000 of money order receipts along with one or two money orders. It was not until Grishaber reported his discovery to Agent Negro that the government was aware of what Grishaber had done and what he had found. At that time Agent Negro simply asked Grishaber to photocopy that which was before him in the form of the receipts and money orders. When Grishaber did so, his action did not constitute a second search or seizure. Grishaber merely made composite pictures of that which he had already observed and which remained open before him. Inasmuch as Grishaber had, by the time of his search on September 21, 2004, been deactivated with respect to the one year

8

agreement beginning March 18, 2004, Grishaber was not authorized to act thereunder nor was he under the supervision or control of a government agent. Consequently, the search in which he engaged was in all respects a private one.

It is, accordingly, ORDERED that the defendant's motion to suppress be, and it hereby is, denied.

The Clerk is directed to forward copies of this written opinion and order to the defendant and all counsel of record.

DATED: July 11, 2006

_____
John T. Copenhaver, Jr.
United States District Judge

9